IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| DABORAH WILLIAMS | : | |
| | : | |
| v. | : | Civil Action No. DKC 19-3370 |
| | : | |
| ARORA HILLS HOMEOWNERS ASSOCIATION INC. | : | |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this action alleging violations of federal, state, and county housing laws is a motion for summary judgment filed by Defendant Arora Hills Homeowners Association, Inc. (ECF No. 27). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the reasons that follow, Defendant's motion for summary judgment will be granted.

**I.   Background**

    **A.   Factual Background**

Unless otherwise noted, the following facts are undisputed and construed in the light most favorable to the nonmoving party. Plaintiff, Daborah Williams, is an African American mother of eight children. In February 2015, she began renting a single-family home located at 12128 Skylark Road in Clarksburg, Maryland (the "Skylark Property"). Seven of her eight children reside with her at this address. Ms. Williams' primary source of income is through government assistance programs. She receives a housing assistance

voucher from the Montgomery County Housing Opportunities Commission.  Ms. Williams rents the Skylark Property from the owner, Mr. Gautam Rana, who purchased the property in 2005 and resides in Florida.

The Skylark Property is part of a master planned community called Arora Hills that consists of 1,330 townhomes, single-family homes, and condominiums.  Arora Hills is operated by Defendant Arora Hills Homeowners Association, Inc. ("Arora").  Arora annually elects a Board of Directors that manages the affairs of the community, including employing professional management agents. (Def. Ex. B4 at 4).[1]  Arora hired Eileen Benecke to serve as the manager of Arora Hills in March 2015.  Ms. Benecke reports to the senior property manager, Michael Eckloff.  As manager, Ms. Benecke's job responsibilities include maintaining all common areas, such as the community pool, and conducting community wide inspections.

Inspections are done by either walking or driving through the community with a camera and taking photos of every lot to document

---

[1] The parties submitted and cite to overlapping exhibits in a completely disorderly and incongruent fashion.  With apologies to readers other than the parties, the court must now also engage in unconventional citations throughout this opinion.  Plaintiff's deposition will be referred to as "Pl. Dep." and Ms. Benecke's deposition will be referred to as "Benecke Dep."  Citations to both depositions will be to the page number appearing on the deposition transcript, rather than the ECF page number.  All other exhibits in the record will be referred to in the same manner in which the parties label them rather than by ECF number and page number, as is customary.

violations of the community's governing documents.[2]   If an inspection reveals a violation, a management staff member documents the violation and mails a first violation notice to the unit owner, along with a photo documenting the violation and requesting a response within ten days.[3]   (Def. Ex. B at 1).   The property is also placed on a list which management uses to conduct follow-up inspections.  (Benecke Dep. at 56).   If the owner does not respond within ten days, the staff member next mails a hearing notice to the owner indicating that the owner may either remedy the violation before the hearing date specified or request to attend the hearing.  If the owner responds indicating correction, the violation is resolved.  Any unresolved violations are compiled into a single report and sent to the Covenants Committee, a subsection of the Board of Directors that meets regularly to review violation reports.  (Benecke Dep. at 135-36; Def. Ex. B at 2).

---

[2] All owners who purchase in the community receive a deed that provides that they take ownership subject to the community's governing documents which include: (1) a Declaration of Covenants, Conditions, Restrictions, and Easements (Def. Ex. B1); (2) By-laws (Def. Ex. B2); (3) Master Rules (Def. Ex. B3); and (4) Community Standards and Guidelines(Def. Ex. B4).  These documents govern the maintenance of lots, storage of personal property, trash, and the parking of cars, and detail the enforcement procedures for violations of such rules, including the authority to impose fines.

[3] If the owner leases the unit to a tenant, management notices are sent directly to the owner at the address on file as the owner's primary residence.  (Benecke Dep. at 42 & 45).  This is because all owners who lease their units to tenants remain responsible for the property's compliance with the governing documents.

Based on the photographs provided by management, the Covenants Committee confirms whether there has been a violation and whether the violation remains uncorrected. (Pl. Ex. 9 at 76-78). If it remains uncorrected, the committee assesses a fine on the unit owner's account. If a fine is assessed, the owner has a right to file an appeal to the full Board of Directors. (Def. Ex. B at 2). If a tenant wishes to be present at the hearing, the owner must request his or her attendance as a witness. (Pl. Ex. 9 at 77). If unpaid fines remain on a unit owner's account, the owner's pool access, and by extension any tenant's pool access, may be suspended pending payment. (Benecke Dep. at 126).

### 1. July 2015: The Pool Incident

Plaintiff's first interaction with Ms. Benecke occurred in July 2015. On July 2nd a conflict arose between Ms. Williams' children and cousin, June Young, and other Arora Hills residents at the community pool. Management received several complaints including: (1) a complaint by Arora Hill's third party pool vendor that Ms. Young was making other patrons uncomfortable; (2) a complaint by a resident that Ms. Young had inappropriately splashed and tickled his children; (3) a complaint by a lifeguard who stated that she felt threatened when Ms. Young approached her from behind; and (4) a complaint that Plaintiff's children had stolen toys out of the lost and found bin. (Benecke Dep. at 75, 110-14).

4

On July 7, 2015, Ms. Benecke sent Mr. Rana and Plaintiff a letter informing them of the complaints made and stating that such actions were offensive, in violation of Section 3.2.2 of the Declaration, and that Plaintiff's pool access would be terminated if another incident were to be reported. (Pl. Ex. 18). Plaintiff, however, remained authorized to use the pool for the remainder of the 2015 season.[4] (Pl. Dep. at 57-58). Shortly after receiving the July 7th letter, Plaintiff called Ms. Benecke and denied the allegations made against her cousin and children. Plaintiff further stated on the call that she believed her family was being "singled out" and "treated unfairly." (Pl. Ex. 4).

### 2. August 2015-March 2016: The First Fine

On August 26, 2015, the Skylark Property was cited for the first time since Plaintiff took occupancy for having a vehicle parked on the lawn in violation of the Declaration. A violation letter was sent directly to the Skylark Property addressed to Mr. Rana. (Pl. Ex. 5; Def. Ex. B12). On October 14, 2015, December 29, 2015, and February 26, 2016, follow-up notices were sent both to Plaintiff and directly to Mr. Rana at his address in Florida.

---

[4] While Plaintiff's complaint asserts that her family has been precluded from using the pool to date, (see ECF No. 1, at 3 & 6), Plaintiff testified in her deposition that her family remained authorized to use the pool for the remainder of the 2015 season. (Pl. Dep. at 57-58). The parties fail to pinpoint an exact date but agree that it was not until April 2016 that Plaintiff's pool access was suspended due to outstanding unpaid fines on Mr. Rana's account. (Pl. Dep. at 58; Benecke Dep. at 112-13).

(Pl. Ex. 5; Def. Ex. B12).   The February notice indicated that the Covenants Committee would review the status of the violation during their next meeting on March 9, 2016.   (Pl. Ex. 5).   On March 9, 2016, the Covenants Committee determined a violation had occurred and issued the first fine against the Skylark Property in the amount of $100.   The fine was applied to Mr. Rana's account on March 23, 2016.   (Def. Ex. B7 at 5).

Sometime after receiving the first fine, Plaintiff personally approached five neighbors living at 12120, 12124, 12126, 12130, and 12132 Skylark Road and asked each of them, individually, if they had received violations of the sort that she had.   Each told her they did not receive any violations.   (Pl. Dep. at 51, 59-72).   Plaintiff states that each of these neighbors own rather than rent their homes and are either Caucasian or Indian.   Plaintiff further claims that the property located directly behind her home, at 12309 Cypress Spring Road, also committed multiple violations but was not cited or fined.   (Pl. Dep. at 73-74).

### 3.   April 2016: The Second Fine and the Interaction with Ms. Benecke at the Community Center

On April 15, 2016, Plaintiff drove to Ms. Benecke's office at the community center to obtain contact information for Arora's corporate management office.   (Pl. Dep. at 136-37; Pl. Ex. 6).   According to Plaintiff, Ms. Benecke was "irate" and refused to give her this information.   (*Id.*).   When Plaintiff pressed Ms. Benecke for the information, she wrote the phone number down on

the back of a business card, directed Plaintiff to the exit, and then "threw" the card on the ground outside and told her to pick it up.  (*Id.; see also* Pl. Ex. 12).   Ms. Benecke contends she merely "placed" the card on the ground outside and that once outside, Plaintiff shouted that she would "love to kick [Ms. Benecke's] ass and would be happy to spend the day in jail to do so."[5]  (Benecke Dep. at 29-30).   Plaintiff took a photo of the number from the card on the ground and called the corporate office that day.  The corporate office provided her with Mr. Eckloff's contact information.

On April 18, 2016, a fine was applied to Mr. Rana's account in the amount of $250.00 for lawn parking.[6]  On April 19, 2016, Plaintiff emailed her landlord asking him to request a hearing to appeal the fine.  (Pl. Ex. 10).  There is no evidence in the record that Mr. Rana ever did so.

Plaintiff states that she and her daughter have, collectively, seen Ms. Benecke drive by their house four or five times since moving in.  (Pl. Dep. at 115-17 & 146-49).  During one

---

[5] Ms. Benecke recalls this incident as taking place in July 2017 instead of April 2016, as the record indicates.  (Benecke Dep. at 30).

[6] While the fine was applied to the account on April 18, 2016, the determination to issue the fine was made days earlier at the meeting of the Covenants Committee on April 13, 2016.  Plaintiff and Mr. Rana received a notice informing them of the hearing outcome on April 18, 2016.  The notice stated that the Covenants Committee had observed "that the gray van has been sitting in the driveway with storage for over six months."  (Def. Ex. B12 at 8).

such instance, in the spring of 2016, Plaintiff saw Ms. Benecke drive by her house at approximately seven in the morning. (*Id.*, at 115).  When Plaintiff "made her presence known," Ms. Benecke drove away.  Plaintiff immediately got in her car and drove to the community center to intercept Ms. Benecke before she entered her office.  Without exiting the car, Plaintiff rolled down her window and asked "Why do you keep driving by my house? What is it that you want? What are you looking for?" (*Id.*, at 151).  Ms. Benecke did not respond.

### 4. May 2016-February 2017: Complaint to Mr. Eckloff and Additional Fines

On May 16, 2016, the Skylark Property was fined $100.00 for lawn parking following a Covenants Committee meeting held on May 11, 2016. (*See* Def. Ex. B12).  Plaintiff wrote a letter to Mr. Eckloff on May 16, 2016, complaining about the numerous violations cited against the Skylark Property.[7] (Pl. Ex. 6).  She stated that she felt she was not being treated equally to her neighbors because they had committed similar violations but were not fined. (*Id.*). Plaintiff attached four pictures which appear to depict violations on neighboring properties. (*Id.*).  She further stated that she was a single parent and that she would fix the violations if she could, implying she did not have sufficient funds to do so.

---

[7] Plaintiff also complained that she was not "notified" of the March 9, 2016 hearing that led to the first fine, however, the record shows that Plaintiff was notified of the hearing date in a letter dated February 26, 2016. (*See* Pl. Ex. 5).

Finally, she stated that she had contacted the county investigator and that such office would intervene if her complaints were not resolved. (*Id.*).   Mr. Eckloff responded two days later informing Plaintiff that she must direct all communications through Mr. Rana as Arora would communicate only with the owner, the party responsible for all violations and fines.  (Pl. Ex. 7).

Following Plaintiff's letter, the next fine was not issued until December 2016, in the amount of $200 for an unlicensed/inoperable vehicle parked in the driveway.  (Def. Exs. B7 at 5 & B12 at 2-3).  The four fines levied against the Skylark Property in 2016 totaled $650.00.

### 5.   March 2017-Present: Evictions and Formal Complaints

In March 2017, Mr. Rana sent Plaintiff an email stating that the fines accumulated on the account had become financially stressful and that he would only renew Plaintiff's lease if she paid $500 per month towards the fines.  (Pl. Ex. 14).  Plaintiff then began paying Mr. Rana monthly towards the fine and the tenancy continued.  On June 11, 2017, Plaintiff filed a complaint with the Montgomery County Human Relations Commission.  (Pl. Ex. 8).  On September 28, 2018, Plaintiff filed an additional complaint with the Maryland Commission on Civil Rights alleging discrimination and retaliation.  (Pl. Ex. 11).  The Skylark Property received additional fines between and after the filing of these complaints. (*See* Def. Ex. B7 at 5-7).  On September 23, 2019, Mr. Rana sent

Plaintiff a text message stating that he believed it was in their mutual interest to terminate the tenancy and that she would have until the end of February 2020 to vacate the property.  (Pl. Ex. 4 citing Pl. Ex. 15).  Fines were assessed again on October 30, 2019, and December 31, 2019. (Def. Ex. B7 at 5-7). As of September 18, 2020, the date of Plaintiff's deposition, she remained living at the Skylark Property.  (Pl. Dep. at 103-105).

In total, twenty-three fines were issued against the Skylark Property between Plaintiff's arrival in February 2015 and June 2020:  four fines in 2016, nine fines in 2017, four fines in 2018, and six fines in 2019.  The fines assessed against the Skylark Property totaled $4,400.  (Def. Ex. B7, at 2-7).

**B.   Procedural Background**

Plaintiff filed her complaint on November 22, 2019, alleging violations of the Fair Housing Act (the "FHA") and its state and local counterparts for retaliation (Count I), hostile environment (Count II), and discrimination (Count III).  (ECF No. 1).  On January 24, 2020, Arora answered.  (ECF No. 8).  A scheduling order was issued on January 27, 2020.  (ECF No. 10).  A settlement conference was held on October 9, 2020, but no settlement was reached.  After the parties jointly moved to extend the deadline for filing dispositive motions (ECF No. 25), Defendant moved for summary judgment on December 4, 2020.  (ECF No. 27).  Plaintiff responded in opposition on January 5, 2021, (ECF No. 32), and

10

supplemented her response twice (ECF Nos. 33 & 34). Defendant replied on January 20, 2021. (ECF No. 35).

## II.  Motion for Summary Judgment

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). A material fact is one that "might affect the outcome of the suit under the governing law." *Liberty Lobby*, 477 U.S. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.,* at 249. In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005), but a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Chung Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001).

To prevail on a motion for summary judgment, the moving party generally bears the burden of showing that there is no genuine

dispute as to any material fact.  No genuine dispute of material fact exists, however, if the nonmoving party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof.  *Celotex*, 477 U.S. at 322–23. Therefore, on those issues on which the nonmoving party has the burden of proof, it is her responsibility to confront the summary judgment motion with an "affidavit or other evidentiary showing" demonstrating that there is a genuine issue for trial.  *See Ross v. Early*, 899 F.Supp.2d 415, 420 (D.Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014). Hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment.  *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro,* 64 F.3d 962, 967 (4th Cir. 1995).

## III. Discrimination under the FHA 42 U.S.C. § 3604(b)

Plaintiff asserts in Count III that Arora, through its agents-Eileen Benecke and Michael Eckloff-discriminated against her in violation of § 3604(b)of the FHA and its state and local analogs on the basis of race, familial status, and source of income.[8]

### A.   Legal Standard

The FHA, also known as Title VIII of the Civil Rights Act of 1968, prohibits public and private parties from engaging in certain

---

[8] The FHA does not protect against discrimination on the basis of "source of income" or the "presence of children."  Thus, Ms. Williams' only cognizable claims under the FHA are for discrimination on the basis of race and familial status.  The state analog protects against discrimination on the basis of race,

discriminatory activities as part of ensuring "fair housing throughout the United States." 42 U.S.C. § 3601. Section 3604(b) of the FHA makes it unlawful "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services of facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). To prove a claim for discrimination under the FHA, a plaintiff must demonstrate that the housing action or practice being challenged was motivated by a discriminatory purpose or had a discriminatory impact. *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 986 (4th Cir. 1984). A plaintiff may prove discriminatory purpose through

familial status, and source of income. The local county code protects against discrimination on the basis of race, source of income, and presence of children. Because the language of 42 U.S.C. § 3604(b), Md. Code Ann., State Gov't § 20-705, and Montgomery Cty. Code § 27-12(a) are nearly identical, the same analysis applies to all of Plaintiff's discrimination claims. Under the FHA, it is unlawful "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). Under Md. Code Ann., State Gov't § 20-705, it is unlawful to "discriminate against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with the sale or rental of a dwelling, because of race, color, religion, sex, disability, marital status, familial status, sexual orientation, gender identity, national origin, or source of income[.]" Md. Code Ann., State Gov't § 20-705(2). Montgomery Cty. Code § 27-12(a)(5) makes it unlawful to "discriminate in the furnishing of any facilities, repairs, improvements, or services, or in the terms, conditions, privileges, or tenure of occupancy of any person."

either: (1) direct evidence of discrimination or (2) by satisfying the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1451 (4th Cir. 1990) (holding that the *McDonnell-Douglas* burden-shifting framework applies to FHA claims).

"Direct evidence encompasses 'conduct or statements' that both (1) 'reflect directly the alleged discriminatory attitude,' and (2) 'bear directly on the contested [housing] decision.'" *Laing v. Fed. Ex. Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (quoting *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006)). A plaintiff "'must present evidence which demonstrates a specific link between the discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the challenged decision.'" *Davenport v. Anne Arundel Cty. Bd. of Educ.*, 998 F. Supp. 2d 428, 433 (D.Md. 2014) (quoting *Braziel v. Loram Maint. of Way, Inc.*, 943 F.Supp. 1083, 1095 (D.Minn. 1996)).

When a plaintiff seeks to prove discriminatory purpose without direct evidence of discrimination, the court analyzes the claim under the *McDonnell Douglas* burden-shifting framework. *See Wise v. Vilsack*, 496 F. App'x 283, 285 (4th Cir. 2012) (per curiam). Under this framework, the plaintiff first must establish a prima facie case of discrimination. *See Boardley v. Household Fin. Corp.*

14

*III*, 39 F. Supp. 3d 689, 709 (D.Md. 2014).  To establish a prima facie case of discrimination, a plaintiff must show that: "'[s]he is a member of a protected class and that [s]he was treated differently than other tenants because of h[er] membership in that class.'" *Roberson v. Graziano*, No. WDQ-09-3038, 2010 WL 2106466, at *2 (D.Md. May 21, 2010), *aff'd*, 411 Fed. App'x 583 (4th Cir. 2011).  If the plaintiff clears that bar, "'the burden shifts to [the] defendant[] to show a legitimate nondiscriminatory reason for [its] actions.'" *Boardley v. Household Fin. Corp. III*, 39 F. Supp. 3d 689, 709 (D.Md. 2014) (quoting *Letke v. Wells Fargo Home Mortg., Inc.*, No. RDB 12-3799, 2013 WL 6207836, at *3 (D.Md. Nov. 27, 2013)).  "Ultimately, 'the burden returns to [the] plaintiff to demonstrate that the reason was a pretext.'" *Id.* (quoting *Letke*, 2013 WL 6207836, at *3).  To meet this burden to present evidence of pretext, a plaintiff must demonstrate both that the defendant's proffered legitimate, nondiscriminatory reason was false, and that discrimination was, in fact, the real reason for the defendant's action. *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (quoting *Jiminez v. Mary Washington Coll.,* 57 F.3d 369, 378 (4th Cir. 1995)).

## B. Analysis

Arora first argues that it is entitled to summary judgment on Plaintiff's discrimination claim because it is not a party to the Plaintiff's lease with Mr. Rana, and thus has no ability to

discriminate in the terms, conditions, or privileges of the tenancy. Alternatively, Arora argues that it is entitled to summary judgment because Plaintiff has neither identified any direct evidence of discrimination nor made out a prima facie case of discrimination under the *McDonnell Douglas* burden-shifting framework.

### 1.   Arora's Role and Relationship to Plaintiff

Arora argues that it cannot be liable for discrimination, because it "cannot discriminate in the terms, conditions, [or] privileges of Plaintiff's rental, or services provided thereunder, because it is not part of the rental arrangement and has no control over rental terms." (ECF No. 27-1, at 9). To support this contention Arora cites to three cases. The first case cited, *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180 (4th Cir. 1999), involved a neighborhood association that brought suit under Section 3604(b) against various Maryland state officials over their decision to construct a highway near the community. The United States Court of Appeals for the Fourth Circuit affirmed the lower court's ruling stating that the plaintiff's "challenge to the highway site selection process is too remotely related to the housing interests that are protected by the [FHA]" to survive dismissal because plaintiff "d[id] not allege that anyone has[,] for discriminatory reasons[,] been evicted from his home or denied the right to purchase or rent housing[.]" *Jersey Heights*, 174

F.3d at 192. Unlike in *Jersey Heights*, here, Plaintiff alleges that Arora's action of continuously fining her landlord for the violations on the property she leased led to her constructive eviction – a decision directly related to her housing interests. Ms. Williams also clearly alleges that the contested housing decisions were motivated discriminatory by intent.

The other two cases Arora cites, *AHF Cmty. Dev., LLC v. City of Dallas*, 633 F. Supp. 2d 287, 302 (N.D. Tex. 2009) and *Cox v. City of Dallas, Tex*., 430 F.3d 734, 746-47 (5th Cir. 2005), are nonbinding and also factually distinguishable. *AHF Cmty. Dev., LLC* concerned allegations that the city of Dallas unlawfully discriminated against residents of an apartment complex by conducting numerous unwarranted tactical police raids designed to harass and intimidate minority residents. The court ultimately held that the city could not have discriminated in the terms, conditions, or privileges of the rental of a unit, or in the provision of services or facilities in connection with the rental of a unit, because the apartment complex, not the city, rented the units to the residents. Clearly, the actions of the municipal police department in that case were far more attenuated than Arora's actions in the instant case. Likewise, in *Cox*, the plaintiffs alleged that the city of Dallas discriminated against them in the provision of services by failing to enforce zoning laws that prohibited illegal dumping near their homes. The court

17

held that section 3604(b) of the FHA was inapplicable because,
assuming the enforcement of zoning laws is a "service" under the
FHA, such service was not "connected" to the rental of Plaintiff's
dwelling, because the plaintiffs complained only that the value of
their homes had decreased, not that they were precluded from
renting or constructively evicted.   The current case is
distinguishable as Ms. Williams claims that she was, in fact,
constructively evicted because of Arora's actions.   In sum, the
cases cited by Arora do not stand for the proposition which Arora
believes they do.   The court also notes that nothing in the text
of section 3604(b) prohibits suits against third-parties or
restricts suits to the parties named in a tenant's rental
agreement.   Rather, the wording of the statute indeed appears broad
enough to encompass Plaintiff's claims.

### 2.   Discriminatory Purpose

In the alternative, Arora argues that it is entitled to
summary judgment because Plaintiff has not demonstrated that any
of its actions were motivated by a discriminatory purpose, as she
has not identified any direct evidence of discrimination nor made
out a prima facie case of discrimination under the *McDonnell
Douglas* burden-shifting framework.   The court agrees.

### a.   Direct Evidence of Discrimination

In the entire record, Plaintiff points to no instance in which
Defendant, or any of its agents, directly mentioned her race,

18

familial status, or source of income.  (Pl. Dep. at 118-21).  The
only statement Plaintiff identifies as supporting her belief that
she was being discriminated against is a remark made by Ms. Benecke
on April 15, 2016, in which she stated: "I don't deal with people
like you."  (Pl. Dep. at 119-20).  This statement does not
constitute direct evidence of discrimination because it neither
directly reflects a discriminatory attitude nor bears directly on
any contested housing decision.  The statement does not directly
reference race, source of income, or familial status and is subject
to several interpretations.  *See Bickford v. Denmark Tech. Coll.*,
479 F. Supp. 2d 551 (D.S.C. 2007) (Holding a remark by a university
president to an employee that "we don't do things like you people
do" in discussing a letter the employee had prepared for him was
not direct evidence of discrimination under Title VII because the
statement was subject to several interpretations).  Nor does the
statement contain any language that could be construed as racially
charged code words.  *See Guimaraes v. SuperValu, Inc.*, 674 F.3d
962, 974 (8th Cir. 2012) ("[R]acially charged code words may provide
evidence of discriminatory intent by sending a clear message and
carrying the distinct tone of racial motivations and
implications.") (citation omitted).  *See Ash v. Tyson Foods, Inc.*,
546 U.S. 454 (2006) (holding that evidence that a plant manager
sometimes referred to employees as "boy" was potentially probative
of discriminatory animus, whether or not accompanied by racial

19

classification).   While Ms. Benecke's comment may be offensive, "all offensive language is not direct evidence." *Eruanga v. Grafton Sch., Inc.*, 181 F. Supp. 2d 514, 521 (D.Md. 2002).   Thus, Plaintiff has not established a genuine dispute over whether Ms. Benecke's statement reflected a discriminatory attitude.

Even if Plaintiff had established a genuine dispute, she has not asserted that the statement "b[ore] directly" on any adverse housing decision.   The statement was not made in connection with the issuance of any violation letter or fine.[9]   Rather, the remark was made in the context of Ms. Williams' request for a phone number for Arora's corporate office.   There is no nexus between the remark and any adverse housing action.   Thus, this one-off remark is insufficient to constitute direct evidence of discrimination. "[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated and '[u]nless the remarks upon which plaintiff relies were related to the [housing] decision in question, they cannot be evidence of [discrimination].'"   *Brinkley v. Harbour*

---

[9] Any adverse action in the form of a fine cannot be causally attributed to Ms. Benecke as the decision to issue fines is made by the Covenants Committee, not Ms. Benecke. *See Schafer v. Maryland Dep't of Health & Mental Hygiene*, 359 F. App'x 385, 389 (4th Cir. 2009) ("When a plaintiff proceeds under a direct evidence claim of discrimination, we have held that in order for the plaintiff to survive summary judgment, [s]he must produce sufficient evidence that the discriminating '[party] possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the [defendant].'") (citing *Hill v. Lockheed Martin Logistics Mgmt.*, *Inc.*, 354 F.3d 277, 291 (4th Cir. 2004)).

*Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999) (quoting *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686 (7th Cir. 1991).

### b.   Prima Facie Case of Discrimination under *McDonnell Douglas*

Although Plaintiff fails to show direct evidence of Arora's alleged discrimination, she may still meet her burden by relying on the three step *McDonnell Douglas* framework.  To meet her initial burden of establishing a prima facie case of discrimination under this framework, Plaintiff must show that she is a member of a protected class and that Arora treated her differently than others *because of* her membership in that protected class.   It is undisputed that Plaintiff is a member of a protected class.[10] Plaintiff, however, offers no evidence sufficient to create a genuine dispute over whether Arora treated her differently *because of* her membership in a protected class.

### 1)   Circumstantial Evidence

Plaintiff asserts that she has generated an inference of discrimination simply by showing that Ms. Benecke (1) was aware that she is African American; (2) was aware that she receives a housing voucher; and (3) was aware that Mr. Rana wanted to sell the Skylark Property.  From the existence of these facts alone, she concludes that: "A genuine issue exists as to whether Beneck[e]

---

[10] As stated previously, Plaintiff is a member of a protected class under federal, state, and local law on the basis of her race, familial status/presence of children, and source of income.

leveraged her responsibility and power to levy violations and fines under the HOA, to aggressively fine the Skylark property. A genuine issue of material fact also exists as to whether Beneck[e]'s knowledge of Williams limited means, contributed and motivated her to continue levying fines, and constructively evict Williams from the Skylark property." (ECF No. 32, at 33). Plaintiff's argument misses the mark. It infers from the fact that Ms. Benecke had both knowledge of Plaintiff's protected characteristics and the authority to issue violation letters that Ms. Benecke issued violation letters *because* she harbored discriminatory animus. Discriminatory motive cannot be inferred merely from the fact that Ms. Benecke was aware of Plaintiff's protected characteristics. While it is *necessary* that the alleged discriminator have knowledge of a plaintiff's protected characteristic, it is not *sufficient* to raise an inference of discrimination.

### 2)   Comparator Evidence

Plaintiff also asserts that she has generated a prima facie case of discrimination using comparator evidence of neighbors who are outside her protected class. Plaintiff asserted in her deposition that her neighbors at 12120, 12124, 12126, 12130, and 12132 Skylark Road, are Indian or Caucasian, and own, rather than rent, their homes. She further stated that such neighbors committed similar violations but were never sent violation notices

22

or fined.  (Pl. Dep. at 66-69).  The only evidence Plaintiff offers
to support this belief was that such neighbors told her they did
not receive fines during in-person conversations they had sometime
after Plaintiff received her first violation.  This assertion,
however, is wholly refuted by the record which demonstrates that
the neighbors at 12120, 12126, and 12130 Skylark Road, did, in
fact receive violations and fines.[11]  (Def. Exs. B8-B11).

Confronted with this evidence, Plaintiff now argues that even
though her comparators also received fines (and necessarily,
violation letters), she was still treated differently with respect
to the *number* of fines she received.  (*See* ECF No. 32, at 15).
The record also refutes this.  Between March 23, 2016, and April
21, 2020, the Skylark Property was fined a total of twenty-three
times.  (Def. Ex. B7).  Plaintiff's neighbors at 12120 Skylark
Road were fined a total of ten times between March 2017 and
February 2019 for violations including improper trash bin storage,
unapproved edging, unapproved architectural changes, exterior home
maintenance, and having a grill.  (Def. Ex. B8).  Plaintiff's
neighbor at 12126 Skylark Road was fined ten times between November
2017 and April 2020 for violations including having a temporary
basketball hoop and unapproved edging.  (*Id.*).  Plaintiff's
neighbor at 12130 Skylark Road was cited eleven times between 2016

_____

[11] Neither party provides the resident transaction report for
the neighboring properties at 12124 or 12132 Skylark Road or
mentions the absence of such reports.

and 2020 for tree/mulch bed maintenance and exterior home maintenance violations. (Def. Ex. B9). While Plaintiff's neighbors were not fined the exact number of times as Plaintiff, they nonetheless were fined often and for similar infractions. To generate an inference of discrimination based on the discrepancy in the number of fines issued, Plaintiff would have to show both that such neighbors committed violations with the same frequency as Plaintiff and that Arora's agents were aware of such violations but chose not to enforce the rules. Plaintiff has submitted no evidence to that effect. Plaintiff's assertions that Arora enforced violations against the Skylark Property more frequently than neighboring properties because of Plaintiff's race, familial status, or source of income is based purely on her own speculation. Such speculation is insufficient to create a genuine dispute of material fact. *See Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330–31 (4th Cir. 1998).

### c. **Legitimate Business Reason under *McDonnell Douglas***

Even assuming, *arguendo*, that Plaintiff *had* proffered evidence sufficient to demonstrate a prima facie case of discrimination, Arora has demonstrated a legitimate business reason for issuing the violations and fines that it issued. Management is obligated to inspect for new and existing violations in the community and the Board of Directors, through the Covenants Committee, is obligated to enforce the rules by assessing fines.

(Pl. Ex. 9 at 76-78).  Because the record shows that each time the Skylark Property was fined, Arora management agents brought the Covenants Committee evidence that the Skylark Property had failed to remedy documented violations, in accordance with the notices received, (*see* Def. Ex. B12), it was the Covenants Committee's obligation to assess a fine.  Thus, to prevail under the *McDonell Douglas* burden-shifting framework, Plaintiff would have "to demonstrate that [Arora's stated] reason was a pretext." *Foster*, 787 F.3d at 252.

### d.   Pre-text under *McDonnell Douglas*

Plaintiff has not produced evidence sufficient to conclude that Arora's proffered reason was false, or that discrimination was the real reason.  The evidence in the record shows that the fines ultimately issued were issued after multiple notices and ample time to correct documented violations.  (*See* Def. Ex. B12). For example, she has not shown that Arora did not enforce the rules in accordance with the procedures established by its governing documents or that Arora chose not to enforce the rules against other residents with the same vigor.   While Plaintiff contends that Ms. Benecke "targeted" her and went out of her way to uncover violations on her property, she relies only on her own testimony that she and her daughter "caught" Ms. Benecke taking pictures outside the Skylark Property early in the morning a handful of times.  These allegations are not inconsistent with Ms. Benecke's

job responsibilities and thus, do not allow for the inference that discriminatory intent was a motivating factor at play. Ms. Benecke testified in her affidavit that surveying properties in the community and taking photographs of violations was routine and that there was no specific time of day in which she was to inspect, and thus fit it in around her other job duties. (Benecke Dep. at 48-50). Plaintiff also makes much of the fact that she was not permitted to attend meetings where the Covenant Committee determined violations and assessed fines. This too, is consistent with Arora Hills' rule that only an owner, not a tenant, may request an appeal and that it is up to the owner's discretion whether to invite the tenant to attend as a witness. (Benecke Dep. at 68 & Pl. Ex. 9 at 76-77). Plaintiff does not contend that Mr. Rana ever requested an appeal, and thus no adverse inference can be drawn from the fact that Defendant did not invite Plaintiff to attend the meeting. This was in keeping with Arora Hills' policies. Because Plaintiff has failed sufficiently to confront the summary judgment motion with evidence sufficient to create a genuine dispute of fact that Arora harbored discriminatory animus, Arora is entitled to summary judgement on Plaintiff's discrimination claim in Count III.

IV.  **Retaliation under the FHA 42 U.S.C. § 3617**[12]

Plaintiff alleges in Count I that Arora retaliated against her in violation of federal, state, and county housing laws by continuing to send violation notices and impose fines upon her landlord after she engaged in protected activity.[13]

A.  **Legal Standard**

Section 3617 of the FHA makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of h[er] having exercised or enjoyed, or on account of h[er] having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section [] 3604."  42 U.S.C. § 3617.  "'[R]etaliation

---

[12] Plaintiff's complaint titles Count I as "Retaliation" but cites to 42 U.S.C. § 3604.  (*See* ECF No. 1, at 7).  The court notes that it is Section 3617, not Section 3604, that prohibits retaliation.  Likewise, Plaintiff's Count I cites to Md. Code Ann., State Gov't § 20-702 for her retaliation claim under state law when it is § 20-708 that prohibits retaliation.

[13] This FHA retaliation analysis applies equally to Plaintiff's retaliation claims under Maryland and Montgomery County law because all three statutes are materially the same. *Compare* 42 U.S.C. § 3617 *with* Md. Code Ann., State Gov't § 20-708; *and* Montgomery Cty. Code, Ch. 27, Art. I, § 27-12(g). *See Rhodes v. Parklane Apartments, LLC,* 2019 WL 7293398, at *3 (D.Md. Dec. 27, 2019) ("Maryland law prohibits retaliation using almost identical language to the FHA.  [*See*] Md. Code Ann., State Gov't § 20-708(1)-(2).  Montgomery County's fair housing law forbids retaliation for 'lawfully opposing any discriminatory practice' or 'filing a complaint, testifying, assisting, or participating in any manner in an investigation, proceeding or hearing' as provided for under county law.  Montgomery Cty. Code, Ch. 27, Art. I, § 27-12(g).  When local laws such as these bear such striking resemblance to the FHA, the [c]ourt applies the same pleading standards.").

claims brought pursuant to the FHA are analyzed under the same standards that are applied to retaliation claims brought under Title VII and other employment discrimination statutes.'" *Hall v. Greystar Management Services, LP.*, 28 F.Supp.3d 490, 495 (D.Md. 2014) (citing *Texas v. Crest Asset Management, Inc*., 85 F.Supp.2d 722, 733 (S.D. Tex. 2000)).  Thus,

> [i]n order to prove a claim of retaliation
> under the FHA, a plaintiff must establish [by
> a preponderance of the evidence] that: (1) the
> plaintiff was engaged in protected activity;
> (2) the defendant was aware of that activity;
> (3) the defendant took adverse action against
> the plaintiff; and (4) a causal connection
> exists between the protected activity and the
> adverse action.

*Hall*, 28 F. Supp.3d at 495 (citing *Matarese v. Archstone Pentagon City*, 795 F. Supp.2d 402, 442 (E.D. Va. 2011)).  If the plaintiff has presented a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its decision, and if the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive.

**B.  Analysis**

As explained in detail below, Arora is entitled to summary judgment on Plaintiff's retaliation claim because Plaintiff fails to make out a prima facie case of retaliation.

**1.    Prima Facie Case of Retaliation**

**a.    Protected Activity**

In order to present a prima facie case of retaliation, Plaintiff must first show that she engaged in protected activity. Plaintiff identifies two complaints which she contends constitute "protected activity" sufficient to support her claim. The first is a verbal complaint Plaintiff made to Ms. Benecke over the phone in July 2015, shortly after receiving the letter from the HOA regarding the pool incident (the "July 2015 Complaint"). The second is a written complaint Plaintiff made in a letter to Mr. Eckloff on May 16, 2016 (the "May 2016 Complaint"). (*See* ECF No. 32-2, at 21-23).

**1)   July 2015 Complaint**

The parties dispute whether Plaintiff's July 2015 Complaint constitutes protected activity. The only evidence in the record regarding the substance of the conversation is Plaintiff's own recollection of the call as stated in her declaration. Plaintiff asserts that she "complained to Beneck[e] that she and the HOA treated [her] family unfairly at the pool and that [her] family had been singled out at the pool." (Pl. Ex. 4). Plaintiff argues that because she voiced her belief that her family was being treated "unfairly" and had been "singled out" she engaged in activity opposing discrimination sufficient to qualify as protected activity. (*See* ECF No. 32, at 21) (citing *McClam v.*

29

*Audio Visual Servs. Grp.*, Civil Action No. TDC-19-0652, at *10-11 (D.Md. May 12, 2020) ("Protected opposition . . . may include staging informal protests and voicing one's own opinions in order to bring attention to [] discriminatory activities as well as complain[ts] . . . about suspected violations.") (internal quotations omitted).

Plaintiff does not assert, however, that she ever told Ms. Benecke that she felt that she or her family was "treated unfairly" or "singled out" *because of* their race, familial status, or source of income. Because Plaintiff did not complain of unequal treatment *on account of* her race, familial status, or source of income, Arora argues that "a reasonable person would not find Plaintiff was raising a complaint of race or income discrimination" and thus, the July 2015 complaint does not constitute protected activity. (*See* ECF No. 35, at 7). The court agrees.

"[T]o qualify as protected activity, an [individual's] complaints must [] communicate a belief that the [defendant] has engaged in . . . a form of [] discrimination based on a protected class[,] . . . Complaints about management activities that would not constitute unlawful discrimination do not count as protected activity." *Chang Lim v. Azar*, 310 F. Supp. 3d 588, 604 (D.Md. 2018) (internal quotations and citations omitted).

> General complaints of unfair treatment are not protected activity. *Romeo v. APS Healthcare Bethesda, Inc.*, 876 F.Supp.2d 577, 587 (D.Md. 2012); *accord Harris v. Md. House of*

> *Correction*, 209 F.Supp.2d 565, 570 (D.Md.
> 2002). However, where the [defendant]
> understood or should have understood that the
> plaintiff opposed an unlawful practice, that
> opposition is protected activity. *Burgess v.
> Bowen*, 466 Fed. Appx. 272, 282 (4th Cir. 2012).
> To determine whether [a defendant] should have
> understood the complaint to constitute a
> protected activity, a court must consider
> whether the [defendant] could have understood
> the complaint in the context in which it was
> made. *Id.* (holding that the employee's verbal
> complaint of being "targeted" should have
> conveyed to the employer a concern of racial
> discrimination); *Okoli v. City of Baltimore*,
> 648 F.3d 216, 223–224 (4th Cir. 2011) (although
> the employee did not explicitly mention sexual
> harassment or convey details of the incident,
> the use of the word "harassment" was enough to
> convey to the employer that her complaint
> "likely encompassed sexual harassment").

*Bowman v. Balt. City Bd. of Sch. Commr's*, 173 F.Supp. 3d 242, 248
(D.Md. 2016). Here, Plaintiff does not assert that she ever
mentioned race, familial status, or source of income during the
call. Even taken in context, the complaint was too general to
have communicated to Arora that Plaintiff believed she was being
unlawfully discriminated against. *Cf. id*. at 249 (finding employer
could have understood its employee's complaint was based on racial
discrimination where the plaintiff was black and complained of a
distinction in treatment between herself and a Caucasian teacher
and labeled the distinction discrimination). Even viewed in the
light most favorable to Plaintiff, the evidence does not support
that the July 2015 phone call "br[ought] attention to
discriminatory activities" or included a complaint about

"suspected violations" of law.[14]  Because Plaintiff's July 2015 Complaint did not communicate opposition to an alleged discriminatory practice, it is not a "protected activity" under the FHA and cannot support her retaliation claim.

### 2)  May 2016 Complaint

Plaintiff also contends the letter she sent to Mr. Eckloff in May 2016 constitutes protected activity.  In the letter, Plaintiff stated that she felt that she was "be[ing] targeted by the HOA, and []very much would like to be treated equally" to her neighbors. (Pl. Ex. 6).  She further added that she was a single parent, that she had contacted the county to investigate the discrepancies, and that she had a "humiliating" interaction with Ms. Benecke in which she was told to "fetch" a business card off the ground.  (*Id.*). Defendant does not dispute that this complaint constituted protected activity.  (*See* ECF No. 27-1, at 19) (referring to the May 2016 letter as Plaintiff's initial complaint of discrimination).  Likewise, Ms. Benecke testified that she understood this letter to be a discrimination complaint.  (*See* Benecke Dep. at 33-34).  Accordingly, Plaintiff may rely on the May 2016 complaint as protected activity sufficient to support her retaliation claim.

---

[14] In fact, Plaintiff testified in her deposition that her belief that she was being discriminated against did not form until later, after she had spoken with her neighbors, received the first violation notice, and observed Ms. Benecke driving by her house. (Pl. Dep. at 52, 112).

b.   **Awareness of Protected Activity**

The parties do not dispute that Arora was aware that Plaintiff made a protected complaint in her May 2016 letter.  Thus, Plaintiff has satisfied the second element necessary for presenting a prima facie case of retaliation, and the court moves on to analyzing the third element: whether the defendant took an adverse action against the plaintiff.

c.   **Adverse Action**

To establish that she suffered an adverse action with respect to a retaliation claim, a plaintiff must show that the adverse action was objectively material.  *See Burlington N. & Santa Fe Rwy. Co. v. White*, 548 U.S. 53, 68 (2006).  A "materially adverse" action is one that "could well dissuade[ ] a reasonable [person] from making or supporting a charge of discrimination."  *Id.*, at 57, 68.

Plaintiff points to two actions she believes constitute materially adverse actions against her.  First, she contends that the multiple fines levied against the Skylark Property constitute adverse action.  (*See* ECF No. 32, at 20) ("Rana's insistence to evict Williams due to the fines, is an adverse action under the Fair Housing Act.").[15]  Plaintiff also contends that the suspension

_____

[15] Following the May 16th letter, another fine was not issued again until seven months later on December 13, 2016.  (*See* Def. Ex. B7 at 5).  The court notes that this excludes a $100 fine that was ultimately issued on May 16, 2016, as the result of a prior unresolved violation for lawn parking.  (*Id.*).

of her family's pool privileges (occurring around April 2016) due to outstanding unpaid fines constitutes a materially adverse action that interfered with her enjoyment of the amenities of her rental property.  (*See* ECF No. 32, at 21).

Plaintiff, however, does not adduce sufficient evidence to demonstrate that either of these actions could be considered an objectively material adverse action.  Plaintiff fails to show that either the violation letters/fines, or the suspension of pool privileges, dissuaded her from "making or supporting a charge or discrimination" or would have dissuaded a reasonable person in her position from "making or supporting a charge or discrimination." *Burlington*, 548 U.S. at 68.

Although the *Burlington* standard for what constitutes an adverse action is an objective one, "'the fact that an [individual] continues to be undeterred in his or her pursuit of a remedy, as here was the case[,] may shed light as to whether the actions [of the defendant] are sufficiently material and adverse to be actionable.'" *Bales v. Md. Judiciary/Admin. Off. of the Cts.*, No. 15-CV-03293-JFM, 2016 WL 6879902, at *17 (D.Md. Nov. 22, 2016) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1214 (10th Cir. 2008)).  Following the alleged adverse actions, Plaintiff continually attempted to remedy what she believed to be discriminatory acts, as demonstrated by her subsequent filing of complaints with the Commission on Common Ownership Communities on

34

June 11, 2017, and with the Maryland Commission on Civil Rights on September 28, 2018. (Pl. Exs. 8 & 11). In fact, Plaintiff even attempted to use the threat of filing of such complaints as leverage to deter Arora from continuing to fine the property, as evidenced by her statements to Mr. Eckloff on May 9, 2016, that "I'm making another attempt to have these concerns resolved before I have the county's investigators get involved" and on May 16, 2016 that "I was able to contact the county and inquire about how to handle these challenges . . . [and] was put in contact with an investigator that handles complaints with HOA . . . if a solution is not found, the county investigator's office will intervene." (Pl. Exs. 6 & 10). Thus, rather than being deterred or dissuaded from filing complaints, the alleged adverse actions actually seemed to encourage Plaintiff to lodge her complaints. Just as Plaintiff was not deterred from standing her ground and pursuing multiple complaints against Arora, the court is not persuaded that Arora's actions would dissuade any other reasonable person from making or supporting a charge of discrimination. Because Plaintiff has not met her burden of satisfying the adverse action requirement of a retaliation claim under the FHA, Defendant is also entitled to summary judgment on Count I.

    **2.**    **Legitimate Business Reason under _McDonnell Douglas_**

Even if Plaintiff _had_ shown an adverse action, and furthermore causation,[16] her retaliation claim would still fail at the second stage of the _McDonell Douglas_ test because, as previously stated, Arora has proffered a legitimate business reason for its actions-that Plaintiff was in violation of the rules-and Plaintiff fails to produce any evidence that Arora's stated reason is pretextual or that discrimination is the true reason.  The record shows that Plaintiff was in fact in violation of the community rules each time she received a fine, including the December 13, 2016 fine. (_See_ Def. Ex. B12).

**V.**    **Hostile Environment Based on Retaliation**

Finally, Plaintiff asserts that Arora violated federal, state, and county housing laws by subjecting her to a hostile environment in retaliation for her protected activity.  (ECF No. 1, at 8) ("Defendant, by and through, its agents or supervisors, unlawfully and continuously retaliated and created a Hostile

---

[16] The suspension of Plaintiff's pool passes occurred in April 2016, prior to her protected complaint, and therefore, could not have been in retaliation for making such complaint.  Plaintiff also has not proffered evidence sufficient for a reasonable juror to conclude that any violation letter/fine was the result of her protected complaint.  Plaintiff's argument for causation focuses only on her initial July 2015 complaint which, as noted above, cannot support her retaliation claim.  (_See_ ECF No. 32, at 22). The timeline alone, however, is insufficient to infer causation. There was a seven-month gap between Plaintiff's May 2016 complaint and the date the next fine was assessed on December 13, 2016.  (_See_ Def. Ex. B7, at 5).

Environment against Plaintiff because of her complaints of discrimination."). Arora argues that a hostile environment claim *based on retaliation* is not actionable under the FHA.[17] Arora asserts that the Department of Housing and Urban Development's regulation defining hostile environment claims under the FHA, 24 C.F.R. § 100.600, precludes recognizing retaliation as a basis for a hostile environment claim. (*See* ECF No. 27-1, at 21). Plaintiff seemingly argues that, because both § 3617 of the FHA, which prohibits retaliation, and 24 C.F.R. § 100.600, which governs hostile environment claims, use the word "interference," a hostile environment claim can be brought based on retaliation. (ECF No. 32, at 28-29).

As Judge Xinis recognized in *Rhodes v. Parklane Apartments, LLC*, it is an "unsettled question" whether a plaintiff may advance a retaliation based hostile environment claim. *Rhodes v. Parklane Apartments, LLC*, 8:19-CV-01463-PX, 2019 WL 7293398, at *5-6 (D.Md. Dec. 27, 2019). The issue need not be resolved in this case because, even if such a claim is actionable, Plaintiff's claim necessarily fails due to lack of evidence that the alleged conduct was sufficiently severe or pervasive.

> Hostile environment harassment refers to unwelcome conduct that is sufficiently severe or pervasive as to interfere with: The availability, sale, rental, or use or enjoyment of a dwelling; the terms,

---

[17] Arora further argues that a state or county hostile environment claim is not actionable. (*See* ECF No. 27-1, at n.13).

> conditions, or privileges of the sale or
> rental, or the provision or enjoyment of
> services or facilities in connection
> therewith; or the availability, terms, or
> conditions of a residential real estate-
> related transaction.

24 C.F.R. § 100.600(a)(2). "Factors to be considered to determine whether hostile environment harassment exists include, but are not limited to, the nature of the conduct, the context in which the incident(s) occurred, the severity, scope, frequency, duration, and location of the conduct, and the relationships of the persons involved." *Id*.

Plaintiff testified that that Ms. Benecke: (1) drove by her home on multiple occasions; (2) once entered onto her property to take pictures of her home; (3) once lifted the cover of her car to see if it had valid tags; (4) documented and reported violations on the Skylark Property; and (5) once threw a business card on the ground and told her to pick it up.  While some of these actions may have been objectionable, they were sporadic and cannot be seen as objectively interfering with the use or enjoyment of Plaintiff's dwelling.  The FHA is not to be construed as a "general civility code[ ]" that prevents rude or undesirable behavior. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  Thus, "offhand comments, and isolated incidents (unless extremely serious) will not" rise to the level of a hostile environment. *Id*.  No genuine issue of material fact exists as to whether Arora's

38

conduct rose to the level required for liability on a hostile work environment claim.   Accordingly, Arora is entitled summary judgment on Plaintiff's Count II.

## VI.   Conclusion

For the foregoing reasons, the motion for summary judgment filed by Defendant will be granted.   A separate order will follow.

                                        /s/
                                    _____
                                    DEBORAH K. CHASANOW
                                    United States District Judge